GILSETH, Appellant, v. RISTY et al, Respondents. (MINNE-
HAHA NATIONAL BANK OF SIOUX FALLS
et al, Interveners.)

## (193 N. W. 132.)

(File No. 5163. Opinion filed April 3, 1923.)

1. **Drains—County Commissioners—Drainage Districts—Filing of Petition for District Gives Board of County Commissioners Jurisdiction to Proceed with Inspection and Survey.**

    The filing of a petition with the board of county commis-
sioners asking for the establishment of a drainage district, gives
the board jurisdiction to proceed with the inspection and sur-
vey, as required by Rev. Code 1919, Secs. 8460, 8461.

2. **Drains—Upon Filing Survey and Report, Board Authorized to Fix Time and Place of Hearing.**

    Upon the filing of the surveyor's report on a contemplated
district, the board of county commissioners is authorized to fix
a time and place for a hearing on the petition, pursuant to
Rev. Code 1919, Secs. 8461, 8462.

3. **Drains—Appeal and Error—Where No Appeal Taken From Order Establishing District, it Becomes Final, and There Can be no Question as to Jurisdiction to Proceed to Carry Out Work.**

    Where no appeal is taken from an order establishing a new
district, the order becomes final, and there cannot be any ques-
tion of the board's jurisdiction to proceed to carry out the
work contemplated by the petition.

4. **Drains—Authority to Proceed With District Petitioned for not Affected Because Repair of Old Project Contemplated.**

    The fact that a project, contemplated in a petition for a
district, involves the repair of an old project, would not affect
the authority of the board of county commissioners to pro-
ceed, since Const., art. 6, Sec. 21, and Rev. Code 1919, Sec.
8458, gives the board the same authority to repair an old
ditch that it has to construct a new one.

5. **Drains—Injunctions—Estoppel—Enjoining Levy of Assessment Held Unwarranted.**

    In an action to enjoin the levy of an assessment, wherein
plaintiff was shown to have taken no appeal from the order
creating the district, nor made any attempt to prevent irregu-
larities practiced by the board of county commissioners, who
were not shown to have exceeded their jurisdiction or acted
fraudulently, and it appeared that plaintiff saw all the work
performed and received the benefits for two years, held that he
should not be permitted to escape payment; he being presumed,
though not a signer of the petition for the district, to know

that an assessment would be made against the benefited prop-
erty.

      Dillon, J., dissenting.

    Appeal from Circuit Court, Minnehaha County; Hon. L. L.
Fleeger, Judge.

    Action by Oluf O. Gilseth against A. G. Risty and others, as
County Commissioners of Minnehaha County,- and Albert A.
Chenoweth and another, copartners, doing business under the firm
name and style of Chenoweth & Rettinghouse, wherein the Minne-
haha National Bank of Sioux Falls; S. D., and others, intervened.
From judgment for defendants, plaintiff appeals. Judgment and
order appealed from affirmed.

    *Bogue & Bogue,* of Parker, and *Parliman & Parliman,* of
Sioux Falls, for Appellant.

    *E. O. Jones* and *Porter & Bartlett,* all of Sioux Falls, for
Respondents.

    (1)  To point one of the opinion, Respondent cited: Hall v.
Slabaugh (Mich.), 37 N. W. 547; County Drain v. Long (Iowa
1911), 130 N. W. 52; Sim v. Rosholt (N. D.), 112 N. W. 50;
Houck v. Little River Drainage District, 239 U. S. 260; Fallbrook
Irrigation District v. Bradley, 164 U. S. 167, 41 L. Ed. 292.

    (3)  To point three, Respondent cited: In Re Sorenson ('S.
D.), 131 N. W. 300; In Re Milne v. McKinnon, 32 S. D. 627, 144 ·
N. W. 117; State v. Pound (S. D.), 150 N. W. 287; Hoyt v.
Hughes Co. (S. D.), 142 N. W. 475; Bergen Township v. Nelson
(N. D.), 156 N. W. 559.

    (4)  To point four, Respondent cited: Rev. Code 1919,
Sec. 8476; In Re Sorenson Drainage Ditch (S. D.), 131 N. W.
300; Steeburg v. Kyle (Ind.), 121 N. E. 537; In Re Judicial
Ditch No. 8 v. Nelson (Minn.), 163 N. W. 135; Chicago & N. W.
Ry. Co. v. Board of Sup'rs. of Harrison County et al (Ia.), 172
N. W. 443.

    (5)  To point five, Appellant cited: Dillon on Corps. (5th
Ed.), 1456; Atwell v. Barnes, 66 N. W. 583; Geib v. Morrison
Co., 9 A. L. R., pp. 842-843-904; City of Dallas v. Ellison, 30 S.
W. 1135.

    Respondent cited: Smith v. Pence, 33 S. D. 516, 146 N. W.
709; Olstad v. Sim, 109 N. W. 66; Hackney v. Elliott, 137 N. W.

433; Edwards v. Cass Co., 137 N. W. 580; Voight v. City of Detroit, 184 U. S. 115; Sheppard v. Barron, 194 U. S. 553, 48 L. Ed. 115; DeNoma v. Murphy (S. D.), 141 N. W. 986; Hoisington v. Price (S. D.), 143 N. W. 776; Smith v. Pence and Pier, (S. D.), 146 N. W. 709; Wilson v. Woolman (Mich.), 94 N. W. 1076; Phillips v. Kankakee Recl. Co. (Ind.), 98 N. E. 804.

POLLEY, J.  During the year 1907 a drainage district, designated as drainage district No. 1, was established in Minnehaha county for the purpose of draining land along the Big Sioux River.  Such district extended from a point immediately north of the city of Sioux Falls, up the river for a distance of about 2½ miles.  The river through this district runs in a southerly direction until it reaches a point just north of the city of Sioux Falls.  It then continues in a southerly direction through or along the western part of the city, then sweeps to the east around the southern portion of the city to a point just north of the northern limits of the city, where it winds away to the east and south.

In 1908, a petition was filed with the county commissioners, asking that said drainage district be extended several miles farther up the river.  Such action was had upon this petition that (quoting from the findings of the trial court) :

"Said petition was allowed, and a resolution adopted by the board of county commissioners, establishing said drainage and designating it as 'drain ditch No. 2,' extending said original drain ditch No. 1 from the upper end of said original drain ditch No. 1 about 12 miles."

A drain ditch was constructed up the valley throughout the entire length of said district as so enlarged.  At the point where the said drain ditch emptied into the river, the bluff or bank of the river is about 100 feet in height.  To prevent the water from the ditch from washing away the river bank or bluff, a concrete trough or spillway had been constructed to carry the water down the hill into the river.  During an unusual freshet that occurred in 1915 or 1916, the said spillway, either because of accident or faulty construction, was washed out and destroyed.  At about the same time the river cut through its bank into the drainage ditch at a point several miles above the said spillway.  This permitted the water from the river, as well as all the surface water that gathered in the ditch, to run down through the ditch over the

said bluff, where the spillway had been, into the river. The water not only tore away a considerable tract of land along the river, and threatened to destroy a portion of the grounds of the state penitentiary, which is situated near that point, but also threatened to destroy the water supply of the city of Sioux Falls and to destroy the water power of the Northern States Power Company.

It was necessary to take immediate steps to control the flow of the water and to retain the water of the river within its natural channel where it flows through and around the city of Sioux Falls. After drainage ditches No. 1 and No. 2 had been constructed, other drain ditches had been constructed farther up the river. The result of the construction of these ditches was to greatly accelerate the flow of water down the valley, and to increase the quantity of water running through the ditches. Because of this increase in the volume of the water, the capacity of these ditches was no longer sufficient to dispose of the surplus water as they were originally intended to do.

Plaintiff in this action is the owner of agricultural land within the drainage area of drainage district No. 2. The increase in the flow of the water from farther up the valley caused the overflow of plaintiff's land, from which substantial damage resulted. To obviate the continuation or recurrence of such damage, plaintiff and others similarly situated held a meeting on the 1st day of April, 1916, and took such action that on the 8th day of April, plaintiff and others who were affected by the condition of the water and of said drainage ditches filed a petition with the board of county commissioners, asking that said spillway be abandoned, and that the water flowing through said ditches be turned through a certain slough or lake in the northern part of the city of Sioux Falls, and thence into the channel of the river above where it flows around said city. A survey of said proposed plan was made, and, after notice to the interested parties, a hearing was had upon said petition and report of said survey. On the 8th day of July following, an order was made granting said petition. Thereafter many conferences were had by the plaintiff and the said petitioners and other interested parties, with the result that the said petition and the said plan of drainage were abandoned. Thereupon a second petition was filed, asking for the re-establishment of drainage ditch No. 1 and 2, for the reconstruction of said spill-

way and for the enlargement of the drainage area so as to include all the land along the river to the outlet of the said spillway. This petition was filed on the 3d day of August, 1916. The board of county commissioners thereupon caused a survey to be made of the entire area contemplated by the said last-mentioned petition. Upon the filing of the report of such survey, the board gave notice of hearing on the said petition, and upon such hearing the board, on the 3d day of October, 1916, made an order, purporting to establish a new drainage district, designated as "drainage ditch No. 1 and 2." This drainage district included the entire area of the two former districts, together with the drainage area along the river through the city of Sioux Falls. The board then proceeded to do the work necessary to carry out the plan contemplated by the said order. The ditches in what had been drainage districts Nos. 1 and 2, were cleaned out, widened, deepened, and diked so as to greatly increase the carrying capacity thereof. Several cut-offs were made in the river so as to accelerate and increase the flow of water through the channel of the river. A new and larger spillway was constructed. The doing of all this work cost approximately $240,000. The board then proceeded to apportion the benefits for the purpose of levying an assessment to pay for said improvement. In order to ascertain the various tracts of land that had been benefited and that should be so assessed, the board employed surveyors to make a topographical survey of the entire area. While this survey was in progress, this action was commenced. Plaintiff seeks to restrain the completion of said survey and the apportionment of benefits, and also to permanently enjoin the making of an assessment to pay for said improvement. Findings and judgment were for defendants, and plaintiff appeals.

[1-3] We do not understand that appellant questions the constitutionality of the law under which the said project was carried out. He claims that the requisite steps to give the board jurisdiction to proceed were not taken, and that, therefore, to permit the board to levy an assessment on his property to pay for said work would be depriving him of his property without due process of law. The filing of the petition, asking for the establishment of a new drainage ditch on the 3d of August, 1916, gave the board jurisdiction to proceed with the inspection and survey of

the proposed drainage area as required by the provisions of Rev. Code 1919, §§ 8460, 8461; Lanning v. Palmer, 117 Mich. 529, 76 N. W. 2. Upon the filing of the surveyor's report, the board was authorized to fix a time and place for a hearing on said petition. This was done, and the notice provided for in section 8461 was given. The hearing was had as provided for in section 8462. Plaintiff, together with many other interested parties, was present at this hearing. The board, after a full hearing, found the drainage, as petitioned for in said petition, to be conducive to the public health, convenience, and welfare, and necessary and practical for the drainage of agricultural land. No appeal was taken from the order establishing the new district. Therefore the order became final, and there cannot, in our judgment, be any question of the board's jurisdiction to proceed to carry out the work contemplated by the petition.

[4, 5] It is contended by the appellant that the project contemplated by the petition was not the creation of a new drainage district or a new drainage ditch, but merely to repair a project already in operation, and that therefore the board was without authority to proceed. But this contention is not tenable. The Constitution (section 6, art. 21) and the statute (section 8458) gives the board the same authority to repair an old ditch that it does to construct a new one. But the two projects were by no means identical. The drainage district involved in this case contains a materially larger area than the combined area of the two old districts. Appellant was present when the order creating the new district was made. If he believed that such order was prejudicial to his rights, or was dissatisfied for any reason with the course pursued by the board, he should have appealed from said order, before the expense of executing the same had been incurred.

Numerous irregularities on the part of the board are alleged, and it may be assumed that the board did in certain instances proceed in an irregular manner, but it is not shown that the board did, in any instance, exceed the jurisdiction conferred upon it by law. It is claimed that on many occasions, various steps in the prosecution of the work were taken by the board, without first having made an order to that effect, from which plaintiff could have appealed. This may be true, but plaintiff was not without

his remedy. In such cases, he could have halted the board by certiorari or injunction.

The petition filed with the board on the 3d day of August, 1916, praying for the creation of drainage ditch No. 1 and 2, asked that the work be paid for by an assessment on the property to be benefited thereby. While plaintiff did not sign this petition, he was present at the hearing thereon, and is presumed to have known that whatever was done in the way of constructing any drain ditches or repairing the old ones would have to be paid for by an assessment on the property that received the benefits. He saw the work in progress, and was advised of all that was done. All the irregularities complained of occurred after the board had acquired jurisdiction of the subject-matter. No fraud or bad faith on the part of the board has been shown. Two years were allowed to elapse after the work was completed before this action was commenced. Appellant having stood by and seen all the work performed without protest, and having received all the benefits that can result therefrom, should not now be permitted to escape payment for the same. The relief asked by appellant is equitable in its nature, but because of the circumstances above shown, all the equities of the case are against appellant and in favor of the board.

The judgment and order appealed from are affirmed.

GATES, J., not sitting.

DILLON, J. I cannot agree with my Associates on the conclusions reached in this case.

The drainage of agricultural lands is declared to be a public purpose, and the counties are granted power to construct levees, drains, and ditches. The county is required to carry on the work. It is the policy of our statutory law to limit the powers of the board of county commissioners in nearly every particular, and to hedge and curtail their powers. Under section 5885 "contracts can be let only on competitive bids and the advertisement for bids must state where the plans and specifications may be examined." This section applies to all contracts for fuel, stationery, and other articles for the use of the county, or labor to be performed, when the amount to be paid for the same during any year exceeds the sum of $100.

Section 8208, C. L., provides that the state engineer shall have general charge and supervision of the construction of all state buildings, to prepare or cause to be prepared all plans and specifications for the same.

Section 8465, C. L., provides that the county commissioners shall let contracts for the construction of the drainage, or for any portion thereof, which shall be let upon competitive bids. When any contract is let the contractor shall give a bond in such sum as shall be approved by the board of county commissioners, conditioned for the faithful performance of his work. For the information of the contractors in bidding upon the proposed drainage, full plans and specifications shall be filed in the office of the county auditor. If, in the judgment of the board, the entire drainage can be constructed at less money than the amount of any bid submitted, the board may cause such drainage to be constructed, hire the necessary labor, and purchase the necessary material for such construction without letting contract therefor.

From the above quotations it will be seen that the law requires plans and specifications for all public works, and that these plans and specifications must be referred to for the purpose of giving information to those wishing to bid on the same.

When the board of county commissioners advertised for bids for the construction of the spillway, they did so under the Stevens survey, but this record discloses that the Stevens plans were abandoned, and the county commissioners rejected all the bids received under the Stevens plans; that thereafter Francis C. Shenehan, an engineer, was employed to prepare plans and specifications for the spillway, but these plans were changed from time to time as the work progressed, and were never filed with the state engineer until about the time the work was completed. Such plans and specifications did not show the character or extent of such improvement or the estimate cost thereof. No advertisement was ever made for bids under these plans. The county commissioners then let a contract to the Sioux Falls Construction Company for the construction of the present spillway on the cost plus plan, allowing said company the total cost of all material, the cost of the labor, and the supervision of the construction work, and to furnish the necessary machinery, tools, and supplies to be used in said construction work, thus allowing said company the total cost

of such construction work, together with 9 per cent profit thereon, as compensation for the construction of said spillway. Such spill-way as constructed had capacity of not more than 50 per cent of what was actually necessary to carry the water from the ditches. No contracts were let, no advertisement made, and no notice was ever given for bids in the construction of drains, cut-offs, retain-ing gates, or other improvements, and no competitive bids were received for such work under either the Stevens plan or the Shen-ehan plan. Construction of the spillway, cut-offs, retaining gates, weirs, enlargement of the ditches, and other improvements were constructed in direct violation of the statutes requiring the con-tracts to be let on competitive bids, and the cost plus contract al-lowing the most of the improvements plus 9 per cent was in viola-tion of the law requiring competitive bids, and therefore illegal and void.

Our statute requires that plans and specifications must be pro-vided for the use of the bidders, so as to disclose the specific thing to be undertaken, and thus to secure fair competition to all who may desire to compete, and such requirements are regarded as part of the law by necessary implication. There can be no intelligent bidding unless all the bidders may know what the con-tract is. 22 R. C. L. 616.

These statutory provisions being mandatory, the county com-missioners cannot evade them. The whole purpose of the statute is to secure economy in the construction of public works, to pro-tect the public from collusive contracts, favoritism, fraud, and to promote actual, honest, and efficient competition in all contracts for public works. These provisions represent the public policy of the state, and ought not to be ignored. The statute does not say the public officer may advertise for bids, but it commands him to do so. It is not that he may, but that he must. All contracts entered into for the purpose of preventing competition in bidding for public works are contrary to public policy, and cannot be enforced.

It is not necessary to show the particlar effect of the con-tract if it is condemned by public policy. McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117.

The law requires the letting to the lowest bidder, and the rule is that plans and specifications must be provided for the use

of the bidders, so as to declare the things to be done. Hannan v. Board of Education, 25 Okl. 372, 107 Pac. 646, 30 L. R. A. (N. S.) 214.

The rule of law is so explicit·that proposals for bids for public work cannot fix the price' to be paid for labor, where the statute requires all contracts for public work to be let to the lowest bidder. Frame v. Felix, 167 Pa. 47, 31 Atl. 375, 27 L. R. A. 802.

This cost plus system in the contracts relative to public works is the most ingenious subterfuge for extorting money from the municipalities that has even been inaugurated by the ingenuity of man. It has no place in our law, because it violates every principle of public policy as annunciated by the statutory law of the state. This system enables a contractor to carry on an important public work without putting in any capital whatever, and the greater sum he can pay for labor, and for material, the greater commission he gets. If he can make a spillway cost $300,000, his commission is $27,000, and he can hire his own superintendents and pay for them out of funds that may be accumulated for the purpose of paying for the construction work. The engineer in this case estimated the cost of the spillway to be $60,000 yet it will probably cost in excess of $200,000.

The cost plus contract is vicious; it eliminates all competitions; paves the way of graft and fraud. It places in the hands of the contractor unlimited powers to accomplish double dealings and duplicity. It allows the contractor to be buyer and seller; to be principal and agent. When he can pay double price for labor and material his own compensation is increased in the same ratio. The more he can squander the greater his financial reward. If he can employ labor and buy material at five times its actual cost, so much the better for him, because it increases his commission five times. He pays himself for the job of superintending his own work. This state ought not to depart from the system of requiring competitive bids on public works, where each party is treated with impartiality and equality in his bidding, for this iniquitous jack pot cost plus system which robs, steals, and plunders.

"The sepulcher of the centuries is filled with the bones of dead evils, slain by man in his climb toward God. You may build, build in your pride and power as deep as the continent, build as high as the Himalayas, but if you build upon human

wrong or human injustice the hour will come when somewhere the heart throb of a woman or the pulse of a babe will beat down the edifice you will rear, topple it in ruins about your nerveless, helpless feet. This is true, and we know it."

About 100 farmers are interested in the drainage ditches Nos. 1 and 2. These parties had completed these ditches, and had paid their assessments. It was a completed and finished job, and they were enjoying the benefits of the drainage improvement. Then came the new scheme to extend the drainage plans by taking in new territory, including the city of Sioux Falls, its streets, parks, and alleys, and to reconstruct a new and expensive spillway, which has largely been completed with only 50 per cent of sufficiency to carry off the waters, and the making of a new survey, with levels, at a cost of $7,500. Let it be understood that this improvement is for drainage of agricultural lands, and the benefits to be received must be sufficient to pay for the intended improvements. If the benefits are not sufficient then the whole scheme is a taking of properties without due process of law. This action is to enjoin the assessment for alleged benefits on the whole system of improvements made on the new scheme from its beginning. A careful examination of this record discloses no apparent benefits can be received by the railroads, parks, streets, and city properties.

I think that Judge Elliot's decision in enjoining the assessment of benefits is right, and was in fact the only conclusion that could rationally be reached, because the relation of benefits of town properties could not, in any manner, be compared with any ratio of benefits that would accrue to the drainage of agricultural lands. This whole scheme evidently was brought about to protect the city's water supply, the power plant, and the penitentiary grounds from endangering flood encroachments.

The city parks, streets, alleys, power plant, and the railroads have all been relieved from assessments by the action of the federal courts. How can there be any justification for assessing other property holders in the city and those interested in the original completed drainage of No. 1 and No. 2 ditches, and at the same time excuse those who have been diligent in preserving their rights by injunction? The surveys being enjoined by the federal courts is res adjudicata. These improvements are all being made with-

out competitive bids, and. were enjoined ·because the acts of ·both! the ·county commissioners and the contractor were ultra vires. The assessment of properties released by the injunction issued by Judge Elliot ·would· cast an additional ·burden upon those interested in the original No. 1 and 2 ditch proceeding.

It is said that the ·court is without remedy because appeals were not taken from the orders, but the acts complained of are ·ultra vires, illegal, and void. It is then said that the plaintiff is estopped. There can be no estoppel, unless there be substantial benefits accruing !by reason of the construction of the ditches as a new project. The various elements of estoppel are wanting in this case. It will not do to say that they have stood 'by and seen the work going on. The complaint is, the mandatory provisions of the statute have not been complied with. Such ultra vires acts as disclosed by this record should be enjoined. Defects and irregularities that are not jurisdictional may. be cured by a new assessment under section 8506, Compiled Laws.

Note—Reported in 193 N. W. 132. See American Key-Numbered Digest, (1) Drains, Key-No. 14(1), 19 C. J. Sec. 55;. (2) Drains, Key-No. 14(3), 19 C. J. Sec. 109; (3) Drains, Key-No. 14(3), 19 C. J. Sec. 119; (4) Drains, Key-No. 14(1), 19 C. J. Sec. 55; (5) Drains, Key-No. 91, 19 C. J. Sec. 262.

·On loss of right to ·contest assessment in drainage proceeding by waiver, estoppel, or the like, see notes in 58 L. R. A. 353; 60 L. R. A. 161, and 9 A. L. R. 842.

As· to what property is liable for assessment for construction of drains and sewers, see notes in 26 L. R. A. (N. S.) 973.